## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS

JOE MORROW,
4515 Cromwell Court, Frisco, Texas 75033,
             Plaintiff,

    v.

VENDOR RESOURCE MANAGEMENT, INC.,
4100 International Parkway, Carrollton,
Texas 75007,

        Defendant.

Civil Action No. _____

**COMPLAINT**

I.    **INTRODUCTION**

1.    Joe Morrow was the Senior Vice President for Operations at Vendor Resource

Management, Inc. ("VRM") responsible for their Real Estate Owned and Portfolio Servicing

Contract ("RPSC") with the Department of Veterans Affairs ("VA"). Despite clear prohibitions

in VRM's RPSC contract, VRM agreed to send veterans' sensitive data overseas to save money

when VRM contracted with a new subservicer, PHH Corporation ("PHH"). Morrow repeatedly

raised concerns internally at VRM about the improper overseas access to sensitive VA data,

eventually escalating his concerns to other senior executives by stating that VRM was

committing fraud and violating the False Claims Act. In response, VRM started an internal

investigation with specialized False Claims Act outside counsel who assured Morrow he would

not face retaliation for his protected activity. Instead, Morrow's responsibilities were stripped,

his direct reports were reassigned to other supervisors, and he was assigned unreasonable and

unachievable tasks. On September 2, 2025, Morrow was placed on indefinite administrative

leave. On December 15, 2025, VRM stopped paying Morrow his salary, in retaliation for his

protected whistleblower activity.

2.    The RPSC is a contract with the VA to help support the VA Loan Guaranty

Program, which services loans after a veteran defaults on their mortgage and the lender submits a

claim.

3.    Morrow was employed at VRM for over seventeen years. He was the Program

Manager for the RPSC contract since it was originally awarded to VRM in 2011 and was VRM's

main point of contact for the VA. As Program Manager for the VA RPSC contract, Morrow

served as the Government-designated accountable official responsible for day-to-day execution,

contract compliance oversight, performance reporting, and protection of the Government's

interests under the contract. In that role, he was responsible for identifying, documenting, and

escalating operational, regulatory, and contractual compliance risks to VRM's senior leadership and legal counsel, and for ensuring that VA requirements were accurately implemented and communicated across internal teams and subcontractors.

4.      The RPSC contains a strict requirement for protecting veterans' data. It prohibits VRM from using offshore staff or allowing any data to be accessed offshore without prior approval from the VA.

5.      VRM decided to use a new subservicer on the RPSC to service the VA loans, PHH. However, PHH informed VRM that it used a global workforce model with most of the work done overseas in India. At VRM's direction, Morrow specifically asked the VA to approve PHH's global workforce and was told "not only no, but hell no." Despite VA's explicit denial, VRM contracted for PHH's global workforce model and sent veterans' sensitive data overseas.

6.      The problems went well beyond failing to safeguard veterans' data. The RPSC contract also included loans in the Veterans Affairs Servicing Purchase ("VASP") program. This high profile and politically sensitive program was the subject of repeated scrutiny by Congress and the press. But, when the VA had time-sensitive questions on the portfolio of loans managed by VRM, VRM could not provide answers. Instead, the staff with the necessary information were all in India and were either asleep due to the time difference, or in one instance, celebrating an Indian holiday.

7.      As a result of VRM's unlawful retaliation, Morrow has experienced debilitating stress and anxiety. Morrow seeks damages as well as reinstatement.

## II.    **PARTIES**

8.      Plaintiff Joe Morrow was the Senior Vice President of Operations at Defendant VRM. He has been employed with VRM for roughly 17 years.

9.      Defendant Vendor Resource Management, Inc. ("VRM") is a company specializing in real estate owned ("REO") asset management. REO properties are those owned by an institution after foreclosure and the foreclosure sale once title has transferred to the new owner. VRM is headquartered in Carrollton, Texas.

### III.   JURISDICTION AND VENUE

10.      This action arises under the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

12.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), as well as 31 U.S.C. § 3732(a), because the Defendant can be found and/or transacts business in this District. At all times relevant to this complaint, the Defendant regularly conducted business in this District.

### IV.   MORROW RAISED VIOLATIONS OF THE FALSE CLAIMS ACT

13.      Under the RPSC, VRM is responsible for servicing tens of thousands of loans to veterans. Servicing involves processing payments from the veterans, maintaining accurate records of the veterans including account history and loan balance, customer service to the veterans, default management including following up on missed payments, managing delinquencies, discussing payment options and other mitigation that would allow a veteran who is in default to stay in their home, and ensuring the VA has proper title and fulsome reporting for the loans the VA owns. If the VA cannot provide a mitigation option that allows a veteran to stay in their home, VRM is responsible for foreclosing on the home, ensuring the defaulted and foreclosed properties remains upkept and marketable, and selling the home after a foreclosure.

14.     The RPSC has certain requirements to ensure that veterans' sensitive data is protected. This includes extensive training that anyone who works with veterans' data must first complete. Further, the contract requires explicit VA approval before any data may leave the United States. The RPSC contains extensive data security requirements and also contains a liquidated damages provision that provides for a payment of $37.50 per affected veteran or beneficiary in the event of a breach of sensitive personal information.

15.     VRM does not have the capability of providing all of the services required by the RPSC and instead subcontracts with a subservicer who specializes in servicing mortgages. The contractual requirements of the RPSC, including those surrounding the safety of veterans' data, explicitly flow down to any subcontractor.

16.     In mid-2023, VRM began the process of changing its subcontractor and began discussions with PHH. VRM engaged PHH due to personal connections between senior leadership in both organizations, rather than an open and competitive process.

17.     From the start, Morrow had concerns about whether PHH could meet VRM's obligations to the VA under the RPSC and repeatedly and consistently raised those concerns to VRM management.

18.     VRM and PHH had an initial meeting in early 2024 that Morrow could not attend. Instead, Morrow provided multiple questions concerning the particulars of PHH's servicing capabilities that he passed along to VRM executives including Cheryl Travis-Johnson, the COO, Jon Van Deuren, the CFO, Clifton Wallace, the Senior Vice President for IT, and Tiffany Fletcher, the Senior Vice President for Vendor Management Support Services, all of whom attended the meeting. Morrow's concerns included whether PHH used offshore staff to service loans.

19.     At the meeting, PHH advised VRM that their subservicing model made use of offshore employees, and that key personnel were based in India.

20.     By January 2024, all of VRM's senior leadership – including CEO Keith Murray and COO Cheryl Travis-Johnson – were aware that PHH would be using offshore employees in India as a key component of its subservicing model to keep costs down.

21.     Morrow realized the potential for noncompliance with the VA's requirements. On May 2, 2024, he sent an email to Fletcher, advising that the VA needed to approve the use of *any* offshore staff on RPSC.

22.     PHH made clear to VRM that if VRM did not use offshore labor located in India, VRM would have to pay significant additional costs. VRM's payments from the VA were fixed and the additional costs would therefore be borne by VRM. Travis-Johnson made clear to Morrow that she did not want to incur the additional expenses associated with only using U.S. based staff. Morrow made clear to Travis-Johnson that VRM would therefore need the VA's approval.

23.     PHH drafted a request to the VA for permission to perform offshore work. Morrow was concerned that PHH's request did not contain the details the VA would need but was instructed by Travis-Johnson to submit PHH's request. Morrow submitted the request to the VA Contracting Officer Representative ("COR"), John Estes.

24.     Estes informed Morrow in an August 7, 2024, email that he did not have a response from the VA regarding the use of offshore workers. Estes did not provide approval for the request.

25.     Morrow specifically informed PHH that it was impermissible for VRM to use offshore labor under the terms of its contract with the VA. In an August 7, 2024, email, Morrow

clearly informed PHH that the terms of the RPSC required that "Contractor shall obtain prior approval from the Contracting Officer prior to having operations not within the United States[.]"

26.     On August 22, 2024, PHH decided to "[go] over Joe's head," and raised the issue with Travis-Johnson. PHH stated that "the onshore / offshore issue is becoming a significant concern for our operational teams," and proposing three separate scenarios. In one of these scenarios, VRM would obtain "[l]ess than full approval from the VA contracting officer," for a proposal that would "perform homeowner facing functions exclusively onshore and...use our blended Global Staffing Model for all other work."

27.     Meanwhile, Morrow had a phone call with VA COR Estes where he informed Morrow that after talking with the Executive Director of the Loan Guaranty Service for the VA, John Bell, Bell's response was "not only no, but hell no."

28.     On August 26, 2024, Morrow informed Travis-Johnson and Murray that Estes verbally denied the Global Workforce Request. On a phone call between Morrow, Travis-Johnson, and Murray, Travis-Johnson and Murray decided that VRM would use PHH offshore staff on RPSC so long as no "customer-facing positions" were located offshore.

29.     Afterwards, at the end of August 2024, Travis-Johnson negotiated the exact terms of the pricing with PHH. Under Travis-Johnson's supervision and direction, VRM informed PHH that it could use offshore staff that was not borrower facing so long as that staff was adequately trained. Travis-Johnson's instruction was neither in the RPSC terms nor communicated by the VA. Instead, it was a lie.

30.     Morrow continued to raise concerns with PHH's use of offshore staff. He specifically raised concerns that the mandated VA training required staff to register using their social security number, something PHH's foreign staff did not have.

31.     The problems continued and came to a head in April 2025, when PHH's use of offshore staffers led to the untimely reporting of RPSC trial balances for the months of February and March 2025.

32.     At one point, the VA called VRM up to three times a day asking why VRM has not yet reported trial balance data. VRM could not report the data until the afternoon. In a call with Morrow the following day, PHH staff indicated that the delay was due to the large number of team members in India being off for a holiday

33.     By April 2025, Morrow had repeatedly raised concerns through multiple internal channels about VRM's compliance with the RPSC contract and the False Claims Act. Despite these concerns, VRM continued its course of conduct. In mid-April 2025, Morrow escalated his concerns regarding PHH's unauthorized use of offshore staff to VRM through internal channels. Morrow's concerns included the specific RPSC contract term prohibiting information from being "stored, sent to, or accessed from outside the United States," the VA COR's denial of approval for offshore work, and the fact that VRM had directed Morrow to proceed with PHH's offshore model despite these prohibitions.

34.     A week later, Morrow reiterated his concerns to VRM, specifically identifying his concerns as potential False Claims Act violations, and emphasizing that his concerns remained unresolved.

35.     On April 29, 2025, Morrow submitted his biweekly updates to VRM's leadership team. In these reports, he raised his False Claims Act concerns with numerous topics, including the late trial balance reports and the use of offshore staff by PHH. This report was first circulated to VRM's leadership team but then deleted from the network and the email was deleted off all the leadership team's emails.

36.     VRM hired counsel that specialized in the False Claims Act to conduct an internal investigation. That investigation included an interview with Morrow where Morrow again raised his False Claims Act concerns. VRM's outside counsel assured Morrow that he would not face retaliation.

## V.    VRM RETALIATED AGAINST MORROW

37.     The retaliation started almost immediately after Morrow made clear that VRM was committing fraud under the False Claims Act.

38.     On May 13, 2025, Morrow traveled to Nashville, Tennessee for a pre-planned meeting with VRM staff and the VA. Despite Morrow's status as the most senior VRM employee at this meeting with the VA, Morrow was excluded from planning meetings. Morrow had previously always been included. While the VA instructed VRM to keep the number of attendees at the meeting low, VRM added two attendees at the last minute without first consulting or informing Morrow. One of those employees said he was directed by Tiffany Fletcher, a VRM executive, to "watch body language and be conscientious to anything that may seem off."

39.     VRM also failed to pay Morrow his full bonus. Bonuses were supposed to be based on a 2024 performance review that should have been completed by February 19, 2025. Then, between February 26 and March 4, Morrow and his supervisor, Travis-Johnson, were supposed to have a discussion of the initial review, and Morrow was supposed to have an opportunity for a final sign off on his review by March 21. Morrow completed his self-assessment in a timely manner but never received an initial review from his manager, had a discussion of that review, or had the opportunity to sign off on the review. Instead, Phyllis Wright, VRM's head of HR, told Morrow that Travis-Johnson provide a rating "verbally to HR."

That secret rating was never shared but gave Morrow the lowest possible bonus under his contract.

40.    The retaliation had a negative impact on Morrow's health and he began feeling shortness of breath and chest tightness. After seeking medical help, Morrow took protected medical leave starting June 4, 2025. On June 18, 2025, VRM unilaterally extended Morrow's leave until July 7, 2025, even though Morrow did not request the extended leave. Morrow questioned this extension and stated he was willing to return to work when cleared by his doctors. On June 30, 2025, Morrow was cleared by his doctors and returned to work.

41.    Upon returning to work, Morrow was informed that his job had completely changed. All of his direct reports were removed. All of his responsibilities were removed. While he remained the VA Program Manager in title, he was not allowed to communicate with the VA unless first approved by Travis-Johnson.

42.    Upon returning to work, Morrow found a letter from the VA responding to a letter sent by VRM on June 4, 2025, "describing the usage of offshore employees in the performance of" the RPSC contract. Morrow, as VRM's VA Program Manager, was not part of the drafting of this letter to the VA.

43.    The VA letter made clear that "the terms of the contract do not allow for the performance of this contract, which requires access to Veteran's Personal Identifiable Information (PII) to take place in a foreign country." The letter further made clear that anyone working under the RPSC contract was required to take the VA training, which requires a social security number to register for. Finally, the letter specifically requested "a list of all Veteran's whose information whose sensitive information [sic] was accessed so all cost associated with this breach can be filed under the liquidated damages clause in the contract."

44.     VRM responded on July 7, 2025, with a misleading response. VRM stated it sent a cease and desist letter to PHH but did not disclose to the VA that it had known about PHH's use of offshore employees since before VRM subcontracted with PHH. VRM admitted that at least 46,942 veterans, with potentially up to 64,508 veterans, had their information improperly accessed overseas. Under the RPSC, VRM is liable for liquidated damages of $1,760,325 to $2,419,050. While VRM stated that staff were taking the training refresher course, VRM did not address how off-shore staff would take the training course as they do not have social security numbers.

45.     VRM's retaliation continued. On July 2, 2025, Wright sent Morrow an email that purports to state the "concerns shared, and the rationale shared for the near-term assignments you were asked to focus on[.]" That email did not accurately reflect Morrow's conversation with Wright and instead raised issues with Morrow's performance that were clearly pretextual.

46.     Further, Wright assigned tasks to Morrow that were impossible to complete. Specifically, Morrow and Morrow alone, was responsible for automating or employing AI in VRM's process of selling foreclosed properties and increasing those sales by 300% within the next six months. As one small example of the infeasibility of the tasks, VRM paid Ernst & Young hundreds of thousands of dollars to advise on automating VRM's REO process. Ernst & Young made numerous recommendations that VRM had yet to implement. But VRM expected Morrow to duplicate and improve on the work of Ernst & Young on his own. These "near-term assignments" were an attempt to manufacture a reason to terminate Morrow as a culmination of VRM's retaliation.

47.     Given the stress from VRM's retaliation, Morrow took medical leave starting July 17, 2025. He was forced to use his remaining sick and vacation days for this leave. Before his

leave expired, VRM offered Morrow paid administrative leave from September 2, 2025, to November 2, 2025.

48.    On October 31, 2025, Morrow was prepared to return to work on Monday November 3, 2025. At 9:29 p.m. on Friday, October 31, 2025, VRM's counsel emailed Morrow's counsel and instructed Morrow to not return to work on November 3.

49.    VRM did not communicate with Morrow again until December 8, 2025, when VRM's outside counsel requested Morrow's counsel provide Morrow's election of benefits for 2026. On December 11, 2025, VRM's outside counsel demanded Morrow return all company property, which Morrow did. Then on December 12, 2025, VRM's outside counsel informed Morrow's counsel that "[e]ffective December 15, 2025, VRM will no longer pay your client's salary. VRM will, however, continue to pay benefits for those benefits which do not require a contribution by your client, including your client's 401(k) and HSA accounts (including a 2026 contribution to your HSA account at the beginning of the year).  Your client can also expect to receive a payout of his accrued vacation and sick leave in his December 12, 2025, paycheck."

50.    The only justification VRM provided for refusing to pay Morrow's salary was VRM's belief that Morrow did not "meaningfully engage with [them] in resolving this matter." VRM has never provided Morrow with a non-retaliatory reason for withholding his salary or refusing to allow him to resume his job responsibilities.

51.    While VRM has followed through on its threatened retaliation and failed to pay Morrow his salary, it has not terminated Morrow. Morrow therefore remains an employee of VRM, but VRM has refused to pay Morrow his contracted salary.

VI.    **CLAIMS FOR RELIEF**

**Claim for Relief I**
**Violations of False Claims Act (31 U.S.C. §3730(h))**
**Retaliation**

52.    Morrow incorporates by reference herein each of the preceding paragraphs as if fully set forth in this paragraph.

53.    Morrow engaged in protected activity under the FCA by alerting Defendant to false or fraudulent practices internally, including issues related to VRM's use of a subservicer using offshore labor without prior authorization from the Department of Veterans Affairs.

54.    Defendant had knowledge of Morrow's protected activity.

55.    Following Morrow's protected activity, Morrow's responsibilities were diminished, Defendant paid Morrow a reduced bonus, and eventually Defendant refused to pay Morrow's contractual salary, all in retaliation for Morrow's protected activity.

56.    Under 31 U.S.C. § 3730(h)(1), an employee is entitled to relief if that employee is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee".

57.    The False Claims Act also provides that Morrow is entitled to reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

**Claim for Relief II**
**Breach of Contract**

58.    Morrow incorporates by reference herein each of the preceding paragraphs as if fully set forth in this paragraph.

59.     Morrow and VRM are parties to Morrow's employment contract.

60.     Under the employment contract, VRM is in part required to pay Morrow his salary of $294,515.98 plus merit pay.

61.     Defendant VRM has breached the employment contract by failing and refusing to pay Morrow's salary.

62.     Morrow has suffered damages as a result of this breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joe Morrow prays that judgment be entered in his favor and against Defendant as follows:

A.      Two times the amount of back pay to which he is entitled;

B.      Reinstatement of Plaintiff to his position or, in the alternative, an award of front pay;

C.      Compensation for lost wages, benefits, seniority rights, and other remuneration;

D.      For pre- and post-judgment interest on any award in this action;

E.      For the amount of reasonable expenses necessarily incurred by Plaintiff in the prosecution of this action;

F.      For all reasonable attorney's fees and costs incurred by Plaintiff; and,

G.      Such other and further relief to which Plaintiff may be justly entitled.

## JURY DEMAND

Per Rule 38 of the Federal Rules of Civil Procedure, Morrow hereby demands a jury trial.

Dated: January 14, 2026                    **BUFFONE LAW GROUP PLLC**


                                           By:    /s/ Samuel J. Buffone, Jr.
                                                  Samuel J. Buffone, Jr.

                                           Samuel J. Buffone, Jr.
                                           Buffone Law Group PLLC
                                           4301 Connecticut Avenue, N.W.,
                                           Suite 452
                                           Washington, D.C. 20008
                                           Telephone: (202) 997-8562
                                           sam@buffonelawgroup.com


                                           **REESE MARKETOS LLP**

                                           Jamison M. Joiner
                                           State Bar No. 24093775
                                           jamison.joiner@rm-firm.com
                                           Joshua M. Russ
                                           State Bar No. 24074990
                                           josh.russ@rm-firm.com

                                           750 N. Saint Paul Street, Suite 600
                                           Dallas, Texas 75201
                                           Telephone: (214) 382-9810

                                           ***Attorneys for Plaintiff Joe Morrow***